J-S12031-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| J.D. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| J.B. | : | |
| | : | |
| Appellant | : | No. 1869 EDA 2020 |

Appeal from the Order Entered September 14, 2020
In the Court of Common Pleas of Delaware County Civil Division at
No(s):  No. 2020 - 003429

BEFORE:  LAZARUS, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:          **FILED AUGUST 16, 2021**

J.B. ("Mother") appeals from the Order denying her Petition to relocate to Pennsburg, Montgomery County, and awarding her and J.D. ("Father") shared legal custody, and Father primary physical custody of their child, J.D., Jr. ("Child") (a male born in April 2019).  We affirm.

In its Opinion, the trial court set forth the relevant factual and procedural history, which we adopt for the purpose of this appeal.  ***See*** Trial Court Opinion, 11/19/20, at 1-14.

Briefly, Child was born in April 2019 to Mother and Father.  In May 2020, shortly after Child's first birthday, Mother left the residence she shared with Father in Wallingford, Delaware County, with Child, in order to reside at her

parents' home in Pennsburg, Montgomery County.[1]  On June 3, 2020, Father filed a custody Complaint and an Emergency Petition for custody, and filed an Amended Petition for custody a week later.  The trial court held a hearing on June 23, 2020, after which the trial court granted Father's Emergency Petition, and granted Mother and Father joint legal custody, with Father having primary physical custody, and Mother having partial physical custody.  On June 26, 2020, Mother filed an Emergency Petition for relocation, and Father filed an Answer and Counterclaim on June 29, 2020.  On June 30, 2020, the trial court denied Mother's Petition, and scheduled a relocation trial for a later date. Mother filed an Emergency Petition to Modify Custody Order on July 10, 2020, which the trial court denied on July 14, 2020.

The trial court held a custody and relocation trial on July 31, 2020, where both Father and Mother were represented by counsel, testified, and presented evidence.  On September 14, 2020, the trial court entered an Order denying Mother's request for relocation.  However, the trial court awarded Mother and Father shared legal custody, Father primary physical custody, and Mother partial physical custody every Sunday from 10:00 a.m. to Wednesday at 4:00 p.m., with exchanges at Father's residence and Mother being responsible for all transportation.

_____

[1] Mother filed a Notice of proposed relocation two days prior to vacating the residence, but the Notice had not been served on Father prior to Mother's departure with Child.  **See** N.T., 7/21/20, at 37, 47, 66, 112-13.

Mother filed a Motion for Reconsideration on October 5, 2020, which the trial court denied. On October 8, 2020, Mother filed a timely Notice of Appeal, as well as a Concise Statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises the following issues for our review:[2]

1. Did the [trial] court abuse its discretion by awarding primary physical custody to [Father]?

2. Did the [trial c]ourt err in stating that [*sic*] proximity of residence factor favors Father[,] when Mother agreed to do all of the driving transportation?

3. Did the [trial c]ourt err in stating that Mother displayed an unwillingness to work with Father?

4. Did the [trial c]ourt err in stating that Father was willing to work with Mother?

5. Did the [trial c]ourt err in stating that Father was awarded primary physical custody because he was credible in his testimony regarding his willingness to work with Mother, his conduct prior to the entry of the Temporary Order was measured and reasonable and in the best interest of [C]hild, that he remains in the home

---

[2] Father argues that Mother waived all issues on appeal as a result of procedural and substantive deficiencies relating to her Concise Statement, Designation of Contents of Reproduced Record, and appellate brief. Father's Brief at 15-24. Our review confirms Mother's failure to file a Designation of Contents of Reproduced Record and procedural deficiencies related to Mother's brief (in particular, Mother's Argument section is devoid of the required distinctive organizational headings separating each issue, as well as citation to applicable law, except for initial generalized reference, and, when applicable, citation to where she raised such issues below). Nevertheless, we decline to find waiver, and proceed with the merits of Mother's appeal. *See* Pa.R.A.P. 2101 (stating that "[b]riefs and reproduced records shall conform in all material respects with the requirements of these rules as nearly as the circumstances of the particular case will admit, otherwise they may be suppressed….").

where [C]hild has lived his whole life, that he would only need child care at night when [C]hild was sleeping and his residence is in a better school district?

Mother's Brief at 4 (suggested answers omitted).[3]

We will address Mother's issues together. First, Mother argues that the trial court erred in finding that Father was the more likely party to encourage and permit frequent and continuing contact between Child and the other parent. *Id.* at 11-12. Mother asserts that the trial court ignored testimony that Mother communicated with Father during the period of time during which she was not permitting Father to see Child, and that the trial court was punishing Mother for her uncertainty as to whether Father would have returned Child to Mother if Mother had allowed Father to see Child. *Id.* at 11. Mother asserts that Father's unwillingness to agree to contact with Mother

_____

[3] While Mother states her issues somewhat differently in her appellate brief than in her Rule 1925(b) Statement, we nevertheless find that Mother preserved her challenge to the trial court's award of primary physical custody to Father. Mother did not present a challenge to the denial of relocation, as she failed to raise the issue in her appellate brief. She also failed to preserve in her Rule 1925(b) Concise Statement and Statement of Questions Involved separate challenges related to the analysis of custody factors 9 and 10; that the Order was punitive and lacked relation to Mother's and Father's work schedules; and consideration of school district. *See Krebs v. United Refining Co.*, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the appellate brief results in a waiver of those issues); *see also In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017). Accordingly, we will address such issues only to the extent that Mother incorporates them within the context of her preserved challenges.

beyond the court-ordered two nights per week should not have resulted in the trial court favoring Father in this regard. *Id.* at 12.

Second, Mother argues that the trial court erred in finding that Father was better able to provide stability and continuity for Child's education, family, and community life. *Id.* Mother asserts that the trial court should have found in favor of Mother, because Mother residing with her parents provides an even greater level of stability for Child. *Id.* Further, Mother asserts that because Child is one year old, maintaining the same residence with Father is inconsequential. *Id.*

In Mother's third issue, she argues that the trial court erred in favoring Father when evaluating the attempts of a parent to turn Child against the other parent. *Id.* at 12-13. Mother asserts that the trial court ignored Father's testimony that he threatened Mother with not returning Child to her, and Father's threats were the reason why she retained Child at her parents' home. *Id.* at 13.

In Mother's fourth issue, she argues that the trial court contradicted itself in initially concluding that Father was more likely to maintain a loving, stable, consistent and nurturing relationship with Child, and that Father was more likely to attend to Child's daily physical, emotional, developmental, educational and special needs. *Id.* at 13-14. Mother asserts that the trial court's subsequent Opinion, which stated that the factor favored both parties,

is important because it weakens the overall support for granting Father primary custody. *Id.*

Fifth, Mother argues that the trial court erred in finding that Father was more available to make appropriate childcare arrangements for Child. *Id.* at 14-15. Mother asserts that no factual basis existed for awarding Father more custodial time than Mother, as Mother was willing to do all of the driving between their residences, and her work schedule is more conducive to caring for Child. *Id.* Further, Mother claims that the trial court made no attempt to work with Mother's and Father's work schedules, and had the trial court done so, each party would have been able to spend more time with Child. *Id.* at 15.

In custody cases under the Child Custody Act (the "Act"), 23 Pa.C.S.A. §§ 5321-5340, our standard of review is as follows:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

> The discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature

- 6 -

of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

***Ketterer v. Seifert***, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting ***Jackson v. Beck***, 858 A.2d 1250, 1254 (Pa. Super. 2004)). Further, "[a]n abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused." ***Bulgarelli v. Bulgarelli***, 934 A.2d 107, 111 (Pa. Super. 2007) (quotation omitted).

"When a trial court orders a form of custody, the best interest of the child is paramount." ***S.W.D. v. S.A.R.***, 96 A.3d 396, 400 (Pa. Super. 2014) (citation omitted); ***see also*** 23 Pa.C.S.A. §§ 5328, 5338. In assessing the child's best interest, the trial court must consider the custody factors set forth in section 5328(a) of the Act, which provides as follows:

**§ 5328. Factors to consider when awarding custody**

**(a) Factors.--**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and

- 7 -

which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).  "All of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order."

*J.R.M. v. J.E.A.*, 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis omitted); *see also* 23 Pa.C.S.A. § 5323(d) (providing that, when a trial court awards custody, it must "delineate the reasons for its decision on the record in open court or in a written opinion or order.").  However, "[i]n expressing the reasons for its decision, there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations."

*A.V. v. S.T.*, 87 A.3d 818, 823 (Pa. Super. 2014) (citation and quotation marks omitted).

With regard to the custody factors, we have stated as follows:

"**All** of the factors listed in [S]ection 5328(a) are required to be considered by the trial court when entering a custody order." *J.R.M. v. J.E.A.*, 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original).  …  The record must be clear on appeal that the trial court considered all the factors.  [*E.D.*, *supra* at 81.]

Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order."  23 Pa.C.S.A. § 5323(d).  Additionally, "[S]ection 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen [Section 5328(a) custody] factors prior to the deadline by which a litigant must file a notice of appeal."  *C.B. v. J.B.*, 65 A.3d 946, 955 (Pa. Super. 2013), *appeal denied*, 70 A.3d 808 ([Pa. ]2013)….

In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." **M.J.M. v. M.L.G.**, 63 A.3d 331, 336 (Pa. Super. 2013), **appeal denied**, 68 A.3d 909 ([Pa. ]2013). A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d). **Id.**

**A.V. v. S.T.**, 87 A.3d 818, 822-23 (Pa. Super. 2014).

Although the court is required to give "weighted consideration to those factors which affect the safety of the child" pursuant to 23 Pa.C.S.A. § 5328(a), we have acknowledged that the amount of weight a court gives any one factor is almost entirely discretionary. **M.J.M. v. M.L.G.**, 63 A.3d at 339. Critically, as we stated in **M.J.M.**:

It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case. **See A.D. v. M.A.B.**, 989 A.2d 32, 35-36 (Pa. Super. 2010) ("In reviewing a custody order … our role does not include making independent factual determinations. … In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand.").

**M.J.M.**, 63 A.3d at 339 (emphasis added).

In its Findings of Fact and Conclusions of Law accompanying its Order, the trial court comprehensively addressed and analyzed the custody factors pursuant to section 5328(a). **See** Trial Court Findings of Fact and Conclusions of Law, 9/14/20, at 15-27. Specifically, the trial court found that custody factors 1, 4, 8, 11, 12, and 13 favor Father; custody factors 3, 5, 9, and 10

favor both Mother and Father, and the remaining custody favors favor neither

party. *See id.* at 15-27.[4]

In its Opinion, the trial court summarized its analysis as follows:

The Findings of Fact and Conclusions of Law dated September 14, 2020[,] contains the trial court's determinations made pursuant to the applicable statutory factors and which support the Final Order entered on the same date. The trial court took into consideration all of the evidence, assessed the credibility of each witness, and determined the weight that should be afforded the evidence in light of the statutory custody … factors. The trial court finally determined that it would be in the best interest of [Child] to … award primary physical custody to Father.

The testimony of record clearly supports the trial court's finding that Father is far more flexible and willing to foster Child's relationship with Mother than Mother is with Father. Although Mother now may advocate for a shared physical custody arrangement, prior to the [c]ourt's Order[,] she was rigid in her opinion that she should have primary custody. In addition, the trial court found that Mother's plan for her residence and employment was not stable and did not present a clear plan for providing [] Child with necessary consistency in his daily life. Mother, while currently living in Pennsburg, Montgomery County with her parents, signed a lease for an apartment in Bryn Mawr, Delaware County[,] about which she could not provide pertinent information[,] and obtained a temporary job in Bucks County requiring travel and extensive amounts of daytime separation from Child. Father's residence and place of employment are within minutes of each other in Delaware County and he has a regular schedule to which Child is accustomed. The trial court further found that Mother had engineered unnecessary conflicts with Father regarding custody and did not in any reasonable manner attempt to amicably resolve their disagreements prior to the trial.

Trial Court Opinion, 11/19/20, at 14-16.

_____

[4] We observe that while the trial court indicated that it found custody factors 9 and 10 in favor of Father, its analysis reveals that the trial court actually found the custody factors in favor of both parties. *See* Trial Court Findings of Fact and Conclusions of Law, 9/14/20, at 22-24.

In each of her issues, Mother disputes the trial court's findings and determinations regarding the credibility and weight of the evidence, as well as the weight attributed to certain factors. Mother, essentially, asks this Court to re-find facts, re-weigh evidence, and/or re-assess credibility to his view of the evidence. This we cannot do. *See D.R.L. v. K.L.C.*, 216 A.3d 276, 286 (Pa. Super. 2019) (stating that it is not this Court's role to re-find facts, re-weigh evidence, and re-assess credibility). Under our standard of review, the trial court's findings of fact and determinations regarding credibility and weight of the evidence are not disturbed absent an abuse of discretion. *See C.R.F.*, *supra*. As we stated in *King v. King*, 889 A.2d 630, 632 (Pa. Super. 2005), "[i]t is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, given [*sic*] due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion…." (quoting *Hanson v. Hanson*, 878 A.2d 127, 129 (Pa. Super. 2005)). After a thorough review of the record, we discern no abuse of discretion by the trial court. To the extent that Mother challenges the weight attributed to any factor by the trial court, we likewise discern no abuse of discretion. *See M.J.M.*, 63 A.3d at 339.

In this case, after careful review of the record, we conclude that the trial court's findings and determinations are supported by competent record evidence, and we will not disturb them. *See C.R.F.*, *supra*. Accordingly, we affirm the trial court's Order.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/16/2021

## IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
## CIVIL ACTION – LAW

J    D

    Plaintiff/Appellee

          v.

J    B

    Defendant/Appellant

No.: 1869 EDA 2020

CP-23-CV-2020-003429

CUSTODY

Barbara Stein, Esquire: Attorney for Defendant/Appellant
Christopher Casserly, Esquire; Attorney for Plaintiff/Appellee

### OPINION

RASHID, J.                                     Filed: 11/19/2020

This is an appeal from an Order dated September 14, 2020, which denied Defendant/Appellant's request for relocation and awarded primary custody of the minor child to Plaintiff/Appellee. Appellant contends that the trial court erred and abused its discretion by denying relocation, awarding primary physical custody to Plaintiff/Appellee instead of shared physical custody, and not giving appropriate weight and consideration to the evidence. Appellant's contentions are meritless.[1]

### PROCEDURAL HISTORY:

1. J    D (hereinafter "Father") and J    B hereinafter "Mother") are the natural parents of J    D    Jr. (hereinafter "Child"), DOB: 04/  /2019.

2. On June 3, 2020, Father filed a Complaint and an Emergency Petition for Custody.

---

[1] Statement of Error #7 has merit due to inadvertent error by the Court.

1

3. On June 10, 2020, Father filed an Amended Emergency Petition in Custody.

4. On June 25, 2020, after hearing on June 23, 2020 before the Honorable Nusrat J. Rashid, Father's Emergency Petition was granted, and the parties were granted joint legal custody, with Father to have primary physical custody, and Mother to have partial physical custody.

5. On June 26, 2020, Mother filed an Emergency Petition for Relocation, which was subsequently denied on June 30, 2020, and the matter was set for scheduling of a Relocation Trial at a later date.

6. On July 10, 2020, Mother filed an Emergency Petition to Modify Custody Order, to which Father filed an Answer and Counterclaim on June 29, 2020 and said Emergency Petition was subsequently denied on July 14, 2020.

7. Thereafter, a Custody and Relocation trial was held on July 31, 2020, resulting in an Order, Findings of Fact and Conclusions of Law dated September 14, 2020.

8. Mother filed a Motion for Reconsideration which was denied without hearing on October 16, 2020.

9. On October 20, 2020, Appellant timely filed a Notice of Appeal/Statement of Errors Complained of on Appeal Pursuant to Pa.R.C.P. 1925(b) of the September 14, 2020.

## FACTUAL HISTORY:

1. Mother testified that she is currently living with her parents in Montgomery County in Pennsburg. (N.T. 7/31/2020 at 35 ¶ 13-15).

2. Mother further testified that she leased an apartment in Bryn Mawr, Pennsylvania, Delaware County. (Id. at ¶ 17-25, at 36 ¶ 1).

2

3. Mother testified that when her and Father were residing together, the caretaking responsibilities changed throughout the course of Child's life. (Id. at 39 ¶ 11-14).

4. Mother testified when Child was first born, she had a c-section and Father primarily took care of Child while she was recovering. (Id. at ¶ 15-17). Mother further testified that she nursed the Child and would do all feedings, including at night. (Id. at ¶ 17-20).

5. Mother testified that Father went back to work when Child was a month old, and then she became the primary caregiver. (Id. at ¶ 20-25).

6. Mother testified when she went back to work, Father would take care of the Child during the day from 8:00 a.m. to 4:00 p.m. (Id. at 40 ¶ 1-7).

7. Mother testified once under the stay-at-home orders due to COVID, she did everything for Child until she left their home.

8. Mother testified to her schedule with Child "when he would wake up in the morning, I got up with him and I would feed him and I changed him and I play with him . . . I listened to music with him. I was really just the one in charge of making sure that he was eating healthy . . ." (Id. at 42 ¶ 1-5).

9. Mother testified that Father would sleep most of the day. (Id. at 42 ¶ 15-17).

10. Mother testified that when she went back to work, it was hard for Father wo wake up to care for Child. (Id. at ¶ 21-25).

11. Mother testified that during the COVID shutdown, Father was still on his nighttime sleep schedule. Mother further testified "At first we didn't know how long we were going to be home, so he didn't want to try to change his schedule and then just have to go right back to night shift, and that would be harder for him, so we still stayed up at night." (Id. at 45 ¶ 1-5).

3

12. Mother testified that Father still stayed up most nights until like 2:00, 3:00 in the morning, and then would sleep in very late the next day. (Id. at ¶ 10-11)

13. Mother testified that she was the one primarily taking care of Child during the pandemic. (Id. at ¶ 13-14). Mother further testified that she would get up with Child around 6:30, 7:00 every morning. (Id. at 46 ¶ 4-5).

14. Mother testified to her daily schedule with Child during the pandemic. Mother testified she would get up with Child, give him a bottle, play with him a little bit, feed him breakfast, and then do some more activities, let the dog out. (Id. at 46 ¶ 9-14).

15. Mother testified that Child likes going out in the backyard with the dogs and playing in the grass. (Id. at ¶ 14-16).

16. Mother testified that she left Father's home on May 31, 2020. (Id. at 47 ¶ 12-13).

17. Mother testified that she wants to relocate to her parents home in Pennsburg. (Id. at 49 ¶ 3-5).

18. Mother testified she got a job offer to work as an eight grade RELA teacher, reading, English, language arts, at Quakertown School District. (Id. at ¶ 15-17).

19. Mother testified that Quakertown School District is nineteen (19) minutes from her parents' house. (Id. at ¶ 19-20).

20. Mother testified that Quakertown School District is located in Bucks County. (Id. at ¶ 21).

21. Mother testified that the Quakertown position is full-time, but not contracted. (Id. at 50 ¶ 3-4). Mother further testified "there's a good opportunity that it could turn into a permanent position, but it's not - - I'm not like a contracted teacher." (Id. at ¶ 6-8).

22. Mother testified that it's a really good school, and a really safe school. (Id. at 51 ¶ 1-2).

23. Mother testified that she received the job offer on the 7th or 8th of July. (Id. at ¶ 5-7).

24. Mother testified that no decisions have been made as to whether the school year will be virtual or in-person. (Id. at ¶ 11-15).

25. Mother testified if she were to physically go into school, Maternal Grandmother would watch the Child while she was in school. (Id. at 54 ¶ 21-25).

26. Mother testified that her brother lives about fifteen minutes away from parents house in Coopersburg with his wife and kids. (Id. at 56 ¶ 1-5).

27. Mother testified Child does not have any special needs. (Id. at ¶ 15-18).

28. Mother testified that Child is not established in any kind of school or daycare in Delaware County. (Id. at ¶ 19-21).

29. Mother testified if she were able to relocate, she wouldn't have any need to place Child in daycare because, Maternal Grandmother is retired and available to watch Child. (Id. at 57 ¶ 2-6).

30. Mother testified the distance between her parents' house and Father's house is forty-nine (49) miles, fifty-four (54) minutes, sometimes a little bit more, sometimes a little bit less. (Id. at 60 ¶ 1-8).

31. Mother testified that "right now, I'm doing all the driving, and I'm completely fine with that." (Id. at ¶ 14-15).

32. Mother testified her proposed schedule is for Father to have Child from Wednesday-Friday, so Father would have his whole time off with Child. (Id. at 61 ¶12-16).

33. Mother testified "that's really the only time that he can take care of [Child] by himself. When he's working nights, he has to depend on his mom to put the baby to bed for him . . ." (Id. at 63 ¶ 1-4).

34. Mother testified she left Father's home on May 31st, and left without telling Father ahead of time that she was going to leave. (Id. at ¶ 20-21).

35. Mother further testified "it was just a bad situation honestly," and "I tried a couple times to talk to [Father] about moving out because we were not together for several weeks prior to me leaving, but whenever I would try to talk to him . . . we just ended up fighting." (Id. at ¶ 23-25; ad 64 ¶ 1-4).

36. Mother testified Father "would threaten to keep the baby from me and to not let me leave the house with him". (Id. at ¶ 4-5).

37. Mother testified she felt like she didn't have a good choice, and was scared to tell Father she was leaving. (Id. at ¶ 19-21). Mother further testified that she was afraid Father would try to stop her from taking Child, and didn't want to leave Child because she was the one taking care of him all the time. (Id. at ¶ 21-24).

38. Mother testified she did not have a long-term plan in place at the time she left, she only knew she wanted to go life with her parents, but was still looking for a job. (Id. at 65 ¶ 4-7).

39. Mother further testified "I didn't want [Child] around like fighting and negativity all the time." (Id. at ¶ 8-9).

40. Mother testified that she and Father were fighting in front of Child, and Father would call her derogatory names. (Id. at ¶ 10-13).

41. Mother testified that once she was at her parent's house, she did not allow Father to see the Child. (Id. at 66 ¶ 18-20).

42. Mother testified that she did not allow Father to see the Child, "because of the numerous times that he had threatened to keep [Child] from me." (Id. at ¶ 22-23).

43. Mother testified that her and Father attempted to work out a temporary schedule, but Father did not want it in writing. (Id. at ¶ 23-24; at 67 ¶ 1-2).

44. Mother testified that in the twenty-three (23) day period that she had Child, she initiated FaceTime with Father nineteen (19) times. (Id. at ¶ 19-21).

45. Mother testified that Child "has a great home life at my parent's house. He has a really adorable nursery and, you know, everything is safe for him." (Id. at 69 ¶ 23-25; at 70 ¶ 1).

46. Mother further testified that Child has a lot of fun and is in a good routine, and Child sleeps well there. (Id. at ¶ 8-14).

47. Mother testified that Child sleeps from 7:30 to 6:30 in the morning. (Id. at 72 ¶ 3-6).

48. Mother testified that the number one reason she is seeking relocation is her job. (Id. at ¶ 8-10).

49. Mother testified that there is a risk of harm to the Child, because Father "has a very physical style of discipline for [Child] that I don't agree with at all and I don't think is appropriate at any age but especially for a 15-month old." (Id. at 78 ¶ 15-22).

50. Mother testified that Father "like grabs him and slaps his hands". (Id. at 79 ¶ 4-5).

51. Mother testified that there were two incidents when Father "took the hard plastic base of the ring stack toy and threw it" at the Child. (Id. at ¶ 5-7).

52. Mother testified that during the stay-at-home orders, Father went and help his friend move. (Id. at 85 ¶ 3-5). Mother further testified that Father also went and golfed with his friends. (Id. at 86 ¶ 10-14).

7

53. Mother testified about an incident when "I was at work, and I had watched the baby cry in the baby monitor and then cry himself back to sleep, and then just slept and slept all morning." (Id. at 87 ¶ 9-11).

54. Mother testified that she thinks and hopes both her and Father would try to foster a relationship between the other parent. (Id. at 90 ¶ 6-8). Mother further testified that she wants Child and Father to have a relationship and be together. (Id. at ¶ 15-16).

55. Mother testified that when her and Father were together, she did the majority of the Child care. (Id. at ¶ 24-25).

56. Mother testified that she splits her time between her apartment in Bryn Mawr and Pennsburg. (Id. at 94 ¶ 4-5).

57. Mother testified that she got an apartment in Bryn Mawr after the last court ruling. (Id. at ¶ 10-11).

58. Mother testified that if her request to relocate were denied, she would live in Bryn Mawr with the Child if it would get her more custody time. (Id. at ¶ 20-25).

59. Mother testified that her long-term goal is to move to Quakertown School District in the next three to four years. (Id. at 98 ¶ 1-7).

60. Mother further testified that it's twenty (20) minutes further away. (Id. at ¶ 8-16).

61. Mother testified that to get to her job, she has to leave at 7:00 a.m. (Id. at 99 ¶ 1-2).

62. Mother further testified that on the days she works, Maternal Grandmother would get the Child up, and watch the Child during the day. (Id. at ¶ 11-15).

63. Mother testified that she spends four and a half hours with Child in a given day, and Child spends approximately six to eight hours being cared for by Maternal Grandmother during the days she works. (Id. at 101 ¶ 10-16).

8

64. Mother testified that she expressed concerns to Father about bringing Child to her parent's house for fear of possible exposure to COVID after her Father had been in the hospital. (Id. at 104 ¶ 12-23). Mother further testified that her Father did a two-week quarantine after being in the hospital before she moved in. (Id. at ¶ 21-23).

65. Mother testified that the dynamic between her and Father was very damaging and toxic to Child. (Id. at 105 ¶ 16-17). Mother further testified that the failure was one hundred percent mutual. (Id. at ¶ 18-19).

66. Mother testified that her parent's started making arrangements for her and Child to move there about a week and a half before she moved. (Id. at 107 ¶ 13-17).

67. Mother testified that she made firm plans to move in the middle of May. (Id. at 110 ¶ 3-6). Mother further testified that she did not make Father aware of her plans to move with the Child. (Id. at ¶ 7-10).

68. Mother testified that she did not do any research about the school district she was moving to prior to her move. (Id. at 119 ¶ 15-19).

69. Mother testified that the Upper Perkiomen school district she moved to is "just pretty average. It's not as good as Quakertown. It's not as good as Wallingford Swarthmore." (Id. at ¶ 21-25).

70. Mother testified that Father "did the bare minimum for the baby during COVID." (Id. at 121 ¶ 13-14).

71. Mother testified that she would want Child to attend Upper Perkiomen School District so that he could be home with her at night, and because she's available at night. (Id. at 127 ¶ 5-8).

72. Mother further testified that she has a more conducive schedule to raising a Child and would want the Child to be in the school district where she is living. (Id. at 129 ¶ 10-13).

73. Mother testified that Father "occasionally," and "very infrequently" played with Child. (Id. at 136 ¶ 6-8). Mother further testified that Father wasn't "actively involved" with Child. (Id. at ¶ 14-15).

74. Mother testified that she does not know nor has she researched the school district in Bryn Mawr where she signed an apartment lease. (Mother testified that she worries about Child getting adequate sleep with Father, because Father "never really cared about schedules and naptimes and that sort of thing," furthermore, Mother testified that she worries about the type of food Father feeds Child. (Id. at 149 ¶ 15-21).

75. Mother testified that Father did not want Child to attend daycare. (Id. at 152 ¶ 16-17).

76. Father testified that he currently resides in Wallingford. (Id. at 158 ¶ 3-4).

77. Father testified that he is employed as a manager at a casino., and has been employed there for nine (9) years. (Id. at ¶ 20; at 159 ¶ 17-19).

78. Father testified that he works from 6:30 p.m. to 2:30 a.m. (Id. at ¶ 22-24).

79. Father testified that he lives "less than 10 minutes away" from work, and typically leaves for work at 6:20 p.m. (Id. at 160 ¶ 1-4).

80. Father testified that he gets home from work before three o'clock, and wakes up at seven o'clock when Child wakes up. (Id. at ¶ 9-13).

81. Father testified that Child has never suffered an injury while in his care. (Id. at 162 ¶ 22-25).

82. Father testified about two occasions where Mother texted him that Child fells and hit head, and fell and bumped his lip while in her care. (Id. at 163 ¶ 3-5).

83. Father testified that he has attended every one of Child's doctor's appointments, except one that Mother did not make him aware of. (Id. at ¶ 15-21; at 164 ¶ 2-4).

84. Father testified he cared for Child the first month after Child was born because Mother was "immobile" and "unable to get out of bed". (Id. at 165 ¶ 6-7).

85. Father further testified that "I took care of the baby all night, brought her the baby to breastfeed, literally did everything for the whole first month." (Id. at ¶ 9-11).

86. Father testified that when Mother returned to work and would leave at 6:30 in the morning, he would care for the Child until Mother returned home at 4:00 p.m. (Id. at ¶ 21-25).

87. Father testified that prior to Mother leaving the home in May 2020, Mother praised him frequently for being a great father. (Id. at 166 ¶ 16-20).

88. Father testified that Mother was concerned about Father doing FaceTime with the Child, because Child would wonder why he wasn't there. (Id. at 168 ¶ 5-10).

89. Father testified that Mother would FaceTime him only after he texted her all day begging to see Child. (Id. at ¶ 16-22).

90. Father further testified that Mother said no to FaceTime "plenty of times" after he asked. (Id. at ¶ 23-25).

91. Father testified that leading up to the hearing, Father was asking Mother for shared physical custody. (Id. at 169 ¶ 13-15).

92. Father testified that Mother was willing to offer Father "two days a week, Monday and Thursday". (Id. at ¶ 16-17).

93. Father testified that while he's at work, his Mother watches Child. (Id. at 172 ¶ 11-14).

94. Father testified that his Mother/Paternal Grandmother gets to his house at 5:30, 5:45, and he leaves for work at 6:20. (Id. at ¶ 15-19).

95. Father testified that Grandmother leaves his house at 4:30, 4:45 in the morning. (Id. at 173 ¶ 1-2). Father further testified that Grandmother is never there when he wakes up with Child. (Id. at ¶ 1-3).

96. Father testified that Grandmother reads Child books, gives him his bottle, and puts him to sleep. (Id. at 174 ¶ 4-5).

97. Father testified that when he wakes up with Child at seven o'clock, "I give him his bottle, some Cheerios or puffs or whatever. We do activities or we watch TV and we play with his toys. He drinks his bottle. We go for walks, we go to the park . . ." (Id. at ¶ 22-25; at 175 ¶ 1).

98. Father further testified that Child naps around 10:30, and he takes a nap at with him. (Id. at ¶ 15-17).

99. Father testified "we're like best friends. We do every single thing together." (Id. at ¶ 22-23).

100. Father further testified that he has a dog, and "it's like [Child's] best friend." (Id. at ¶ 1-3).

101. Father testified four hours of sleep and another two-hour nap is "perfectly good for me to get through my day." (Id. at 176 ¶ 18-20).

102. Father testified that this sleep schedule does not affect his work, and he is able to perform his work duties "perfectly fine." (Id. at ¶ 21-22).

103.    Father testified that he didn't want to change his shift at work to daytime hours, because with his current schedule "I'm able to spend every single minute of my day with my son." (Id. at 177 ¶ 14-15).

104.    Father testified that he does not feel overburdened or overwhelmed, and is comfortable asking for help, if needed. (Id. at 179 ¶ 11-18).

105.    Father testified that he has baby gates in the areas where Child spends most of his day. (Id. at.180 ¶ 16-18). Father further testified that everything in his home is "perfectly baby-safe". (Id. at 181 ¶ 4).

106.    Father testified that he lives in a great, family-oriented neighborhood, nearby parks. (Id. at ¶ 16-19).

107.    Father testified the school district he lives in is "one of the best school districts in the state". (Id. at 183 ¶ 3-4).

108.    Father further testified that "the elementary school is about three minutes away, and the high school and middle school are about two minutes away". (Id. at ¶ 6-8).

109.    Father testified that he can communicate with Mother "perfectly fine". (Id. at 190 ¶ 2-4).

110.    Father testified that his Mother takes care of Child on Friday, Saturday, and Sunday nights, and he is off work on Wednesday and Thursday. (Id. at 192 ¶ 19-25).

111.    Father testified that he plans to stay in the same house. (Id. at 194 ¶ 15-16).

112.    Father testified that he wants Child to go to school in the Wallingford Swarthmore School District. (Id. at ¶ 23-24).

113.    Father testified that he does not hit his son. (Id. at 195 ¶ 13-15). Father further testified that he taps Child on the hand, and will redirect him to something else. (Id. at ¶ 15-17).

114.    Father testified that he would never keep the Child from Mother. (Id. at 197 ¶ 22-25).

115.    Father testified that his brother sometimes helps out and plays with Child while his paternal grandmother is watching Child. (Id. at 205 ¶ 16-23).

116.    Father testified that paternal grandmother has never had to stay over longer than 4:30, 4:45 in the morning, or feed or bathe Child. (Id. at 207 ¶ 13-15).

117.    Father testified that since the entry of the temporary order three weeks prior to the hearing, Mother did not request to FaceTime with the Child. (Id. at 212 ¶ 23-25).


## DISCUSSION

The primary concern in any custody case is the best interest of the Child. "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the Child's physical, intellectual, moral, and spiritual well-being." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super 2006) (citing *Arnold v. Arnold*, 847 A.2d 674-677 (Pa. Super. 2004)).

This matter is governed by 23 Pa.C.S. §5322 et seq., which applies to disputes relating to child custody matters. 23 Pa. C.S. §5328(a) provides that all relevant factors must be considered to determine the best interests of a child who is the subject of a custody dispute and sets forth those factors, which "affect the safety of the child" and must be given weighted consideration in determining the best interest of the child. In rendering a determination of a party's request for relocation, this trial court was required to consider the relevant factors set forth in 23 Pa. C.S.

14

§5337(h) insofar as they impact the final determination of the best interests of the child. In determining whether to grant a proposed relocation, the court shall consider the factors enumerated under 23 Pa. C.S. § 5337(h), giving weighted consideration to those factors which affect the safety of the child. Pursuant to 23 Pa. C.S. § 5337(h), the party opposing the relocation has the burden of establishing that the relocation will serve the best interest of the child as shown under the factors set forth in subsection (h).

In the instant matter, the trial court was determining not only physical custody but also Mother's request to relocate the Child. Therefore, the trial court was bound to determine not only what was in the Child's best interest as set forth at 23 Pa.C.S. § 5328(a), but also the relocation factors as set forth in 23 Pa.C.S.A. § 5337(h). The Findings of Fact and Conclusions of Law dated September 14, 2020 contains the trial court's determinations made pursuant to the applicable statutory factors and which support the Final Order entered on the same date. The trial court took into consideration all of the evidence, assessed the credibility of each witness, and determined the weight that should be afforded the evidence in light of the statutory custody and relocation factors. The trial court finally determined that it would be in the best interest of J.D.J. to deny relocation and award primary physical custody to Father.

The testimony of record clearly supports the trial court's finding that Father is far more flexible and willing to foster Child's relationship with Mother than Mother is with Father. Although Mother now may advocate for a shared physical custody arrangement, prior to the Court's Order she was rigid in her opinion that she should have primary custody. In addition, the trial court found that Mother's plan for her residence and employment was not stable and did not present a clear plan for providing the Child with necessary consistency in his daily life. Mother, while currently living in Pennsburg, Montgomery County with her parents, signed a

15

lease for an apartment in Bryn Mawr, Delaware County about which she could not provide pertinent information and obtained a temporary job in Bucks County requiring travel and extensive amounts of daytime separation from Child. Father's residence and place of employment are within minutes of each other in Delaware County and he has a regular schedule to which Child is accustomed. The trial court further found that Mother had engineered unnecessary conflicts with Father regarding custody and did not in any reasonable manner attempt to amicably resolve their disagreements prior to the trial. Finally, the trial court determined that Mother's relocation would substantially impair Father's custody rights and was not in the Child's best interests.

Each allegation in the Statement of Errors is addressed as follows:

1. THE COURT ERRED BY DENYING MOTHER'S REQUEST TO RELOCATE WITH THE MINOR CHILD, J.D.J., DATE OF BIRTH APRIL  , 2019.

This contention is without merit.

Mother testified that she filed her Notice of Relocation on the Thursday or Friday before the Sunday that she moved with the Child from Delaware County to her parents' home in Montgomery County. (N.T. 112 at ¶ 9-19) She further testified that she did not advise Father that she had moved out of their residence until after she had already left. (N.T. 112 at ¶ 20-25; 113 at ¶ 1-4)

The Notice of Relocation in Paragraph 7 provides the reasons for the move and does not include a proposed custody schedule in Paragraph 8.

Section 5337(l) provides that "[i]f a party relocates with the Child prior to a full expedited hearing, the court shall not confer any presumption in favor of the relocation." 23 Pa.C.S.A. § 5337(l). In the instant matter, Mother relocated the Child to Montgomery County without Father's

16

consent and prior to a full hearing on the relocation request. Mother searched for and received employment on July 7 or 8, over a month after she relocated (N.T. 51 at ¶ 5-7) and the new position is not permanent or contracted. (N.T. 50 at ¶ 6-8) Mother testified she did not have a long-term plan in place at the time she left, she only knew that she wanted to go live with her parents. (N.T. at 65 ¶ 4-7). She further testified that her reason for moving out of the shared residence was not related to employment and was solely a result of the relationship issues with Father. (N.T. 139 at ¶ 2-11) Mother testified that she could have worked outside of Delaware County and remained residing there. (N.T. 138 at ¶ 6-22). Additionally, Mother gave Father no notice, either verbally or in writing in a pleading that she had obtained employment. The record reflects that the first notice Father had of the new employment was at the trial on July 31. The Notice of Relocation in Paragraph 7 only references the relationship problems between the parents and that Mother wants to move to Pennsburg to reside with her parents, not even that she was going to apply for employment. Although Mother states in the Notice that Father threatened that in the event of a breakup that custody would be on his terms, the Court did not find that the alleged threats supported a relocation.

Mother further testified that she did not do any research about the school district she was moving to prior to the move. (N.T. at 119 ¶ 15-19). She testified about the Upper Perkiomen school district in which her parents live as "...not a bad school district, it's not a good school district. It's just pretty average. It's not as good as Quakertown. It's not as good as Wallingford Swarthmore." (N.T. at ¶ 21-25). Even though the Child will not attend school for another three to four years, the trial court found that Mother's reason to relocate the Child from a better school district to one not as high performing was not in the Child's best interests.

17

Mother presented no evidence or testimony indicating that relocation would benefit the Child so as to warrant his relocation from Delaware County. Neither the proposed new residence, Mother's new employment nor the Child's eventual possible school districts supported relocation. Although the Court agrees that the parents' relationship was unhappy and tumultuous, the end of the relationship was not a sufficient reason for relocation.

Upon careful consideration of the evidence in light of the relocation factors, the trial found that relocation was not in the best interest of the Child and that the record supported a denial of Mother's request to relocate the Child.

## 2. THE COURT ERRED BY DENYING RELOCATION IN THAT THE CHANGE WOULD NOT SIGNIFICANTLY IMPAIR FATHER'S CUSTODIAL RIGHTS.

This contention is without merit.

A Notice of Relocation pursuant to 23 Pa.C.S. §5337(c) is required to be filed before a parent makes a change in the residence of a Child which significantly impairs the ability of the other parent to exercise custodial rights. The statute is designed to give notice to a party with custody rights that the other custodial party intends to change his or her geographical location and a modification of a custody arrangement will be necessary to allow the relocating party to continue to exercise custody rights. Section 5337(c) obviously envisions a change in the relocating party's geographical location that will impact custody and arms the nonrelocating party with the information necessary to assess the proposed change of circumstances.

In the instant matter, Mother testified that she filed a Notice of Relocation which implies that she believed that her proposed relocation would significantly impair Father's custodial rights. Mother cannot now claim that the change would not have significantly impaired Father's custodial rights when she *de facto* admitted same by filing the Notice.

18

Regardless of the filing of the Notice of Relocation, the record reflects that the two residences, Father's in Wallingford, Delaware County and Mother's, now in Pennsburg, Montgomery County are approximately one (1) hour in travel time and forty-eight (48) miles between in distance. Mother also testified that her long-term goal is to move to the Quakertown School District located in Bucks County (where she has gained temporary employment) in the next three to four years. (N.T. at 98 ¶ 1-7) which is twenty (20) minutes further away from Father's residence. (N.T. at ¶ 8-16). Notwithstanding Mother's offer to do all transportation, the current and future distance and commute time are substantial enough to result in a significant impairment to Father's custodial rights.

Upon careful consideration of the evidence in light of the relocation factors, the trial court found that relocation was not in the best interest of the Child and that the record supported a denial of Mother's request to relocate the Child.

3. THE COURT ERRED IN DENYING RELOCATION IN THAT PERMITTING RELOCATION WOULD HAVE BEEN IN THE CHILD'S BEST INTERESTS, BECAUSE THE CHILD COULD ENJOY EQUAL TIME WITH BOTH PARENTS.
4. THE COURT ERRED BY NOT ORDERING SHARED PHYSICAL CUSTODY WHICH WOULD HAVE TAKEN INTO ACCOUNT BOTH PARTIES' INDIVIDUAL WORK SCHEDULES.

6. THE COURT ERRED IN SEEMINGLY PREFERRING PATERNAL GRANDMOTHER OVER THE MOTHER DURING TIMES WHEN MOTHER COULD HAVE CUSTODY OF THE CHILD. MOTHER PROPOSED THAT SHE HAVE CUSTODY OF THE CHILD DURING THE FIVE EVENINGS THAT FATHER WORKS AT THE CASINO. MOTHER IS A TEACHER AND SHE PROPOSED THAT SHE HAVE THE CHILD ON WEEKENDS WHEN SHE DOES NOT WORK. THE COURT IGNORED THE PARTIES' WORK SCHEDULES IN ENTERING THE SCHEDULE. MOTHER WAS GIVEN CUSTODIAL TIME DURING HER WORK TIME WHICH IS NOT THE BEST USE OF MOTHER'S TIME.

These contentions are without merit.

Although the trial court can consider shared physical custody, it is within the discretion of the trial court to determine whether shared physical custody or "equal time" is in a Child's best interests.

Mother instantly argues that she has always proposed "equal time" as an option to Father. Her argument is not credible. The record shows that both before and during the custody trial, Mother was unyielding in her position that she be awarded primary physical custody.

Father credibly testified that prior to the trial, he asked Mother for a shared physical custody arrangement (N.T. at 169 ¶ 13-15) and that Mother was only willing to offer him "two days a week, Monday and Thursday". (N.T. at ¶ 16-17). Even in email correspondence on June 6 between counsel attached as an Exhibit to Father's Amended Emergency Petition, Mother, through her counsel, offered only three (3) hours of custody time. The Court does not find it credible based on the record that Mother ever extended an offer of shared physical custody with Father between May 31 and the Temporary Order.

During the trial, Mother's position was that due to Father's interactions with Child prior to May 31, that she believed that there was a risk of harm to child. She emphasized the magnitude of her care of the Child since birth (N.T. at 41 ¶ 20-25, 42 ¶ 1-18, 44 ¶ 19-25, 45 ¶1-14, 90 ¶ 20-25) and disparaged Father's involvement with the Child, claiming that he, among other things, grabbed and slapped the Child's hands, (N.T. at 79 ¶ 4-5) and threw a hard-plastic toy at the Child. (N.T. at 79 ¶ 5-7). She testified that she feared that Father's physical style of discipline presented a danger to the child, (N.T. at 78 ¶ 14-25), that he was barely involved in the daily care of the Child and only infrequently played with him, (N.T. at 136 ¶ 6-8), that she worried about the Child getting adequate sleep with Father, because Father "never really cared about schedules and naptimes", and she worried about the food that Father feeds Child. (N.T. at 149 ¶ 15-21) She

20

further testified that Father kept a firearm in his nightstand drawer which presented a danger to the child. (N.T. at 82 ¶ 21-25, 83 ¶ 1-23) Although it is commonplace that one parent over the other often assumes a more substantive responsibility of daily child care duties, especially at the newborn and infant stage, this Court found that Mother attempted to position herself as the actual parent and Father as almost an uninvolved bystander. Both Mother and Father credibly testified as to the division of duties within the family home, however, Mother's characterization of Father as an uninvolved, dangerous and oftentimes, "bad" parent, were unwarranted and not supported by credible evidence. Although Mother testified that she would try to foster a relationship between Father and Child, (N.T. at 90 ¶ 6-8), and that she wants Child and Father to have a relationship, (N.T. at ¶ 15-16), the trial court did not find Mother ever wanted a shared custody arrangement. The record reflected Mother's complete mistrust and disdain for Father and his parenting skills and capacity and there was simply no evidence presented during the trial that Mother wanted him to have "equal time".

The Court considered the work schedules of both parents and found that Mother's work schedule, although somewhat speculative at this time in light of the COVID-19 restrictions, was not a factor in her favor. Mother testified that to get to her job, she would have to leave her parents' home at 7:00 a.m. (N.T. at 99 ¶ 1-2) and that on the days she works, Maternal Grandmother would get the Child up, and watch the Child during the day while she taught eighth grade English virtually. (N.T. at 52 ¶ 14-25, 53 ¶ 1-25, 54 ¶ 1-25). Mother testified that she would spend four and a half hours with Child in a given day, and Child would spend approximately six to eight hours being cared for by Maternal Grandmother during the day. (N.T. at 101 ¶ 10-16). The record reflected that Mother would completely rely on Maternal Grandmother for Child care while both working remotely and in person in the school.

21

possible in the home in which he is familiar and for his routine to remain as stable and consistent as possible. Therefore, the trial court found that there is no harm to the Child to spend custodial nights at Father's home with his Paternal Grandmother just as there is no harm for the Child to spend custodial days at Mother's home with Maternal Grandmother.

Mother, at no time, suggested that she would take the Child to Father every day that she is working as a teacher so that the Child could be in Father's custody instead of being taken care of by Maternal Grandmother. Of course, such a suggestion would be ludicrous in light of the distance between the residences. Therefore, the trial court, in attempting to reconcile the need of both parties to have Childcare during their custody periods, determined that the work schedules should not be a hindrance to custodial time and that neither parent should be penalized for having to work and requiring Childcare.

Therefore, upon careful consideration of the evidence in light of the relocation factors, the trial court found that relocation was not in the best interest of the Child and that the record supported a denial of Mother's request to relocate the Child.

5. THE COURT ERRED IN CONTINUALLY REFERENCING THE TWENTY-THREE (23) DAYS THAT MOTHER MAINTAINED CUSTODY OF THE CHILD WHEN SHE ORIGINALLY LEFT FATHER'S RESIDENCE. THE CORUT FAILED TO GIVE APPROPRIATE WEIGHT TO FATHER'S THREATS TO KEEP THE CHILD HIMSELF AND ENTER INTO A WRITTEN AGREEMENT WITH MOTHER. FURTHERMORE, MOTHER FACETIMED FATHER NINETEEN (19) TIMES IN 23 DAYS IN ORDER FOR HIM TO TALK TO THE CHILD.

This contention is without merit.

The trial court acknowledged that the parties attempted to work out a custody arrangement prior to the hearing on the Emergency Petition, however, the Court found that Mother did not engage in reasonable negotiations and was not credible in her claims that she did so. Although the record reflects that the parties discussed a temporary arrangement, Father did not want to commit

23

in writing, and Mother did not want a verbal agreement. (N.T. 7/31/2020 at 66 ¶ 23-24; at 67 ¶ 1-4). Instead of Mother allowing Father to see the Child as much as he could, she denied him physical because he did not acquiesce to her demands. Father testified credibly that Mother subsequently denied him any physical contact with the Child and that during those initial twenty-three (23) days he "texted her all-day begging" to see his Child after which she would Facetime him. (N.T. at 168 ¶ 21-22). Father further testified that Mother was concerned about Father doing FaceTime with the Child, because Child would wonder why he wasn't there. (N.T. at 168 ¶ 5-10). The Court found that Mother's concern about Facetime was not in the best interests of the Child.

The trial court acknowledged that the unhappy relationship may have necessitated the cessation of their romantic relationship. However, the trial court also recognizes that statements such as those allegedly made by Father are often made in the heat of the moment, not based on actual fact or intent to carry out a verbal threat. There was no evidence presented by Mother that Father ever came to her parents' home to take the Child by force or that he ever threatened to do so. For Mother to have offered Father the opportunity to physically see the Child for only a couple of hours during almost a month was unreasonable and does not support Mother's claims that she will foster the relationship between Father and Child.

Mother testified that she wanted Father and Child "...to see each other during that time when they were apart. We just couldn't come to an agreement on anything." (N.T. at 90 ¶ 10-13) Although Mother may have been willing to allow Father to see Child, she was only going to permit it on her terms. Her inflexible past behavior is a fair indicator of how she will co-parent in the immediate future. The trial court did not have any other evidence of Mother's intentions other than the short period of time prior to the trial, and it was clear that Mother wanted to control Father's contact with Child.

24

The record supports the trial court's determination that pursuant to both 23 Pa.C.S.A. § 5328(a)(1)(13) and (23 Pa.C.S.A. § 5337(h)(5), that Mother has shown an unwillingness to work together with Father in the best interests of the Child and has attempted to use contact with the Child to force Father to acquiesce to her demands.

Therefore, upon careful consideration of the evidence in light of the custody factors, the trial court found that awarding primary physical custody to Father was in the best interest of the Child.

7. THE COURT ERRED IN STATING THAT EVEN THOUGH MOTHER AGREED TO PROVIDE ALL TRANSPORTATION THAT THE CUSTODY FACTOR CONCERNING "PROXIMITY OF RESIDENCE" FAVORS FATHER. MOTHER ARGUES THAT SINCE MOTHER AGREES TO DO ALL OF THE DRIVING, THE FACTOR WOULD NOT IMPACT EITHER PARTY.

This contention is with merit.

The trial court erred inadvertently and incorrectly assessed this factor in Father's favor. Based on the evidence, this factor favors neither party.

8. THE COURT ERRED IN STATING MOTHER DISPLAYS MORE OF AN UNWILLINGNESS TO WORK WITH FATHER. FATHER TESTIFIED HE WANTED TO KEEP THE SCHEDULE "AS IS" WHICH AT THE TIME OF THE HEARING WOULD HAVE GIVEN MOTHER ONLY TWO NIGHTS OF CUSTODIAL TIME WITH THE CHILD.

This contention is without merit.

As discussed in detail above, Mother's conduct prior to the trial evidenced a clear unwillingness to engage in reasonable decision making with Father or to keep Father involved in the Child's life unless it was on her terms and pursuant to her control. Father testified that he was satisfied with the schedule that the Court entered on a temporary basis. This is evidence only that he agreed with the trial court's prior decision for temporary custody.

25

Therefore, upon careful consideration of the evidence in light of the custody factors, the trial court found that awarding primary physical custody to Father was in the best interest of the Child.

### 9. THE COURT ERRED IN CONSIDERING SCHOOL DISTRICT AS A FACTOR WHEN THE CHILD IS ONLY 17 MONTHS OLD.

This contention is without merit.

The trial court considered Mother's ability to make long term stable plans as a factor in determining whether relocation was in the best interest of the Child. However, Mother introduced the topic of school enrollment in her own direct examination and testified that she would enroll the Child in her parents' school district, Upper Perkiomen. She further testified that she would like for him to go to Quakertown School District because it is her long-term goal to live in that district where she works (even though her teaching job is not permanent nor contracted, (N.T. at 50 ¶ 2-8; at 97 ¶ 7-23) Although the trial court, upon objection, limited testimony regarding school district to the area where Mother currently lives, it is interesting that Mother has plans to move the Child again in the next couple of years with no discussion having taken place with Father. Mother further admitted, as noted above, that the Upper Perkiomen School District is not as good as Father's district, Wallingford-Swarthmore. Mother cannot now claim that the trial court should not have considered the school district when she introduced evidence of same on her own direct examination.

Therefore, whereas the issue of where the Child will attend school in four years was not a controlling factor in the trial court's decision, the issue of whether Mother has made an appropriate choice by requesting relocation to a school district that is subpar than Father's and whether she currently has stable plans for the Child's residency are factors that the trial court did consider when determining what is in the best interests of the Child.

26

Therefore, upon careful consideration of the evidence in light of the custody factors, the trial court found that awarding primary physical custody to Father was in the best interest of the Child.

10. THE COURT ERRED IN STATING THAT THERE WAS AN "ESTABLISHED PATTERN OF CONDUCT OF MOTHER THWARTING FATHER'S RELATIONSHIP WITH THE CHILD. MOTHER REMOVED THE CHILD TO HER PARENTS' RESIDENCE WHEN HER RELATIONSHIP WITH FATHER WAS BOTH DESTRUCTIVE TO HER AND INTOLERABLE. THERE WAS NO CUSTODY ORDER AT THAT TIME. AFTER THE FIRST EMERGENCY HEARING THE COURT ALLOWED MOTHER ONLY TWO OVERNIGHTS PER WEEK FROM JUNE 25, 2020 TO SEPTEMBER 14, 2020. SUBSEQUENTLY, THE CURRENT CUSTODY ORDER ON APPEAL ALLOWES ONLY THREE NIGHTS PER WEEK FOR MOTHER EVEN THOUGH MOTHER AGREED TO DO ALL OF THE DRIVING. THERE IS NO LEGITIMATE REASON WHY THIS IS NOT AN EQUAL CUSTODY SCHEDULE. THE COURT IGNORED THE PARTIES' WORK SCHEDULES AND MOTHER'S PLEA FOR EQUAL CUSTODY AND INSTEAD CHOSE TO PUNISH MOTHER FOR THE TWENTY-THREE DAYS SHE KEPT HER CHILD AT HER PARENTS' HOME, WHEN THE PARTIES FIRST SEPARATED.

11. THE COURT ERRED BY SEEMINGLY USING THE COURT ORDER TO PUNISH MOTHER FOR THE TWENTY-THREE DAYS THAT MOTHER INITIALLY KEPT THE CHILD AT HER PARENTS' HOME AS EVIDENCED BY A TOTAL OF 6 FACTORS AS ANALYZED BY THE COURT MENTIONING MOTHER'S INITIAL TWENTY-THREE DAYS WITH THE CHILD. MOTHER BELIEVES THE COURT ORDERS ARE UNREASONABLE AND PUNITIVE IN THAT MOTHER SUGGESTED AN APPROPRIATE 50/50 CUSTODY SCHEDULE TO THE COURT, WHICH WAS IGNORED . MOTHER'S PROPOSAL WOULD HAVE MAXIMIZED BOTH PARTIES' TIME OFF FROM WORK. MOTHER PROPOSED THAT FATHER WOULD HAVE CUSTODY WEDNESDAY STARTING AT NOON (BECAUSE HE WORKS TUESDAY NIGHTS) TO FRIDAY AT 4:00 P.M. (THIS IS THE EQUIVALENT OF FATHER'S WEEKEND). IN ADDITION, THE PROPOSED ALTERNATE SUNDAYS. THE COURT IGNORED MOTHER'S ANALYSIS OF FATHER'S OVERNIGHT WORK SCHEDULE.

These contentions are without merit.

All of these issues have been fully discussed above, however, the trial court must specifically address Mother's claim that the Order on appeal is punitive in nature. The evidence supported a finding that Mother is substantially less likely to encourage and permit frequent and

continuing contact between the Child and Father, that her Notice of Relocation lacked reasonable legal basis, and that denial of relocation and awarding primary custody to Father are in the best interest of the Child.

As fully discussed above, although Mother now claims that she is in favor of a shared physical custody schedule, she never requested a shared or equal custody schedule during the trial, either in testimony or argument from counsel. There was no 50/50 schedule, appropriate or otherwise, ever presented by Mother at the trial, therefore the claim that the trial court ignored such a suggestion is completely without merit.

Mother testified that Father should have custody from Wednesday at noon until Friday at 4:00 p.m. and every Sunday during the day from 10:00 a.m. to 4:00 p.m. (N.T. at 61 ¶ 4-25, 62 ¶ 1-21). Two nights per week and one day every other week or a total of eight (8) nights out of thirty (30) or (31) monthly days is not shared or equal physical custody – it is a partial physical custody schedule. Each parent was clearly seeking primary physical custody and this Court found that the factors weighed in Father's favor for an award of same.

Interestingly, Mother's post-Order Motion for Reconsideration contains a shared custody proposal in which Father should have every Tuesday from 4:00 p.m. to Friday at 4:00 p.m. This proposal was contrary to Mother's trial testimony and was only made after Mother received the Order. Furthermore, Mother testified at trial that she would move into an apartment in Delaware County if she did not get the result that she wanted, however, the Motion for Reconsideration is silent on whether Mother actually moved following the trial. Finally, as discussed above, Mother's testimony evinced an extremely low opinion of Father's parenting skills and capacity so as make her fearful for the Child's safety. Mother now suggests a shared physical custody that would effectively put the Child in the danger about which she was so afraid. Mother's testimony at trial

28

regarding Father's parenting was not credible and it is not credible for her to now claim that she has always suggested shared physical custody.

Father was awarded primary physical custody because he was credible in his testimony regarding his willingness to work with Mother, his conduct prior to the entry of the Temporary Order was measured, reasonable and in the best interests of the Child, he remains in the home where the Child has lived in whole life, he would only need Childcare at night while the Child is sleeping thus allowing him to spend days with the Child, his residence is in a better school district than Mother, and he has a stable home and work routine. The Court's determination of primary physical custody is not meant to disparage Mother's love of the Child or her parenting skills, only that the factors as applied to the evidence made primary custody with Father more appropriate.

Therefore, upon careful consideration of the evidence in light of the custody factors, the trial court found that awarding primary physical custody to Father was in the best interest of the Child.

12. THE COURT ERRED BY IGNORING MOTHER'S TESTIMONY THAT FATHER THREATENED HER, FROM THE TIME THE BABY WAS BORN, THAT HE WOULD STOP HER FROM TAKING THE CHILD AND SHE WAS SCARED. ONCE THERE WAS A COURT ORDER IN PLACE, GIVING MOTHER ONLY TWO NIGHTS PER WEEK, SHE NEVER VIOLATED THE ORDER.

This contention is without merit.

The trial court did not ignore Mother's testimony related to alleged threats by Father. To the contrary, the trial court considered Mother's testimony and found it credible. The Court found that Mother was credible in her claims that Father told her he would stop her from taking the Child especially since she was threatening to relocate him without Father's consent. The trial court, however, did not find it credible that Father said or did anything that would cause fear of physical harm from Father, as there was no credible evidence presented of same. Father was threatening

29

Mother that he would stop her because Mother was threatening Father that she was going to move the Child to Montgomery County. However, Father's knee jerk response is not a defense for Mother's actions. If Mother is claiming that she relocated the Child without Father's consent because of fear of physical retaliation from Father, then that claim lacks any validity or basis in the record. Furthermore, Mother did not include any claim of imminent physical danger in her Notice of Relocation nor did she claim same at trial.

Additionally, the record is devoid of any attempts by Father to take the Child by force or physically confront Mother after she left the home. Mother is simply not credible in attempting to attribute some sense of danger to her leaving with the Child.

Finally, this trial court is not in possession of any information regarding the conduct of the parties subsequent to the entry of the Order. Mother's post-Order actions are irrelevant to the appeal and should not be considered by this Honorable Court.

13. THE COURT ERRED BY LENDING MORE CREDIBILITY TO FATHER'S TESTIMONY OVER MOTHER'S WITHOUT ANY SUPPORTIVE EVIDENCE.

This contention is without merit.

In order to assess the best interests and general welfare of the Child or Children, it is the duty of the trial judge to make the fullest possible inquiry in custody actions, *Commonwealth ex rel. Cox v. Cox*, 255 Pa.Super. 508, 388 A.2d 1082 (1978); *Commonwealth ex rel. Ashfield v. Cortes*, 210 Pa.Super. 515, 234 A.2d 47 (1967), which requires the trial court to afford the appropriate weight to the evidence in light of the factors and to consider all relevant facts in making its determination. All pertinent facts and circumstances surrounding the contesting parties must be fully explored and developed, *Sipe v. Shaffer*, 263 Pa.Super. 27, 396 A.2d 1359 (1979) in its consideration and application of the statutory custody and relocation factors.

Under the applicable standard of appellate review for a custody case, it is only when a a trial court, in reaching its conclusion, overrides or misapplies the law or exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias or ill will as shown by the evidence of record, that a finding of abuse of discretion is appropriate. However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. *Lombardo v. Lombardo*, 515 Pa. 139, 146, 527 A.2d 525, 529 (1987). Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

The sum of Mother's contentions on appeal is to characterize the Court's Order as punitive and to claim that Mother's testimony was unreasonably and capriciously disregarded when in actuality, the trial court carefully considered all of the pleadings and evidence and then carefully applied all of the factors. Mother is particularly at issue with this trial court's focus on the "twenty-three (23) days", however, the trial court was bound to determine the weight of the evidence, and in doing so in a fair and unbiased manner, found that the amount of time that Mother kept the Child from Father was crucial. This trial court analyzed how Mother's past conduct impacted the best interest of the Child, the most important being to have a meaningful relationship with both parents. The record supports the finding that Mother moved the Child away from Father without his consent and then exerted unreasonable control over custody while trying to force Father into signing an agreement. Mother's failure to allow Father to see the Child for that length of time was indicative of what could possibly happen if the Child was allowed to relocate and Mother were to have primary custody.

31

Additionally, Mother had no plan when she relocated other than to live with her parents. She did not obtain employment until after she had relocated. She intends to move from her parents' home within the next few years to a location in Bucks County that will be even a longer distance from Father. Mother is a teacher and could have obtained a job in closer school districts, however, she never even attempted to gain employment within a reasonable distance from Father's home. She claimed at trial that she got an apartment in Bryn Mawr, Delaware County, however, there was no evidence produced of same at the trial other than her testimony. Mother further testified that if the result of the trial was not in her favor she would return to live in Delaware County. There is no indication in the record that she moved back to Delaware County. No Petition for Modification was filed requesting a shared custody arrangement based upon her returning to live in Delaware County. Furthermore, Mother's Motion for Reconsideration does not state that she returned to live full time in Delaware County. Mother was simply not credible in her reasons to relocate the Child and her actions in total were not in the best interests of the Child.

## CONCLUSION:

For the foregoing reasons, the Trial Court's Order dated September 14, 2020 denying Mother's relocation, and awarding primary physical custody to Plaintiff/Appellee, should be affirmed on appeal.

BY THE COURT:

NUSRAT J. RASHID, J.

32